[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
The plaintiff has brought this suit seeking to recover $78,779.09 from the defendant for nursing home care rendered to her mother. The parties have agreed to all the essential facts in this case including that the defendant's mother, Gloria Wood, became a resident at the plaintiff's skilled nursing home known as "Mediplex of Newington" on December 4, 1995, and remained until her death on February 27, 1998. Mrs. Wood entered the home pursuant to a contract between the plaintiff and the defendant, who signed the contract in her capacity both as "the responsible party," as well as in her capacity as power of attorney by virtue of a document dated February 3, 1994. Beginning October 1995, she took control of her mother's finances and made certain transfers of money for both estate planning purposes and to qualify her mother for Medicaid assistance.
Mrs. Wood's account with the plaintiff was kept current from her admission in December 1995 through December 1996. The defendant then made a series of transfers from her mother's account in January 1996 comprising of five gifts in the sum of $5,880.00, one gift to three individuals including herself in the amount of $15,456.25, and one gift in the sum of $4,835.00 or a total for all of $49,691.25. The defendant also paid out of her mothers's account the sum of $31,760.00 for a private duty aid or companion to her mother while her mother was at the plaintiff's facility. Those payments totaled $600 per week for fifty hours of work per week and continued for 53 weeks through August 13, 1997. The defendant made no further payments on her mother's account commencing January 1, 1997, leaving a balance at her death of $78,779.09.
In March 1997, the defendant applied for Title XIX, Medicaid assistance for her mother. On March 1, 1999, the State of Connecticut Department of Social Services issued a preliminary decision denying the application because of the transfer of assets from Mrs Woods' accounts from November 11, 1994 through January 1996, rendering her ineligible for assistance until April 2002. As part of its decision, the Department of Social Services found that $483,847.00 was transferred including the sum of $81,451.25 discussed above and $285,000 which was part of a revocable trust made by her husband who had died January 7, 1996. That decision also noted that Mr. Wood signed a new will on August 2, 1995, and Mrs. Wood was neither named as a beneficiary under the trust or will. This court received no evidence on whom Mr. Wood designated as beneficiaries of those documents. Finally, this court received evidence that the defendant was employed by the plaintiff for a period of ten years as the CT Page 4070-f plaintiff's business manager. The preliminary decision was upheld on July 29, 1999.
 II
This contest concerns two paragraphs of the contract. Section IV, paragraph two, states that the responsible party does not personally guarantee or serve as surety for the payments due the plaintiff. It does however, indicate that the responsible party can be liable for the failure to perform certain obligations. Specifically, it states: "[t]he responsible party does not personally guarantee or serve as surety for payment as described in Section II, Paragraphs 1 through 5. The responsible party agrees that his or her liability for failure to perform any of the other obligations set forth in this agreement shall be determined in accordance with these Paragraphs." This section is in conformance with federal law, see 42 U.S.C. § 1396; and Connecticut law, CGS § 19a-550 (b) (26).
In contrast to this prohibition are the provisions in the section labeled "financial agreements," specifically, Section II,[1]
subparagraphs 8(5) and (8). Subparagraph 8(5) states: "[i]f the responsible party has received a transfer of assets from the resident that results in the resident's ineligibility for Medicaid assistance, the responsible party agrees that these assets or an amount of the responsible party's funds at least equal to these assets, will be used to pay for the cost of care and services rendered to the resident until the resident is determined to be eligible for Medicaid assistance by the Connecticut Department of Income Maintenance in accordance with applicable law." Subparagraph 8(8) states: "Responsible Party Control ofor Access to Resident's Funds: If the responsible party has control of or access to the resident's income and/or assets, the responsible party agrees that these funds shall be used for the resident's welfare, including but not limited to making prompt payment for care and services rendered to the resident in accordance with the terms of this agreement." (Emphasis supplied).
The issues of this case are resolved by this latter subparagraph. It requires the responsible party, if she has control of the resident's funds, to use those funds to pay the facility for the care of the resident. This is the situation in this case. It matters not to this court that the account was current while the defendant was gifting money for estate planning purposes or to qualify her mother for Medicaid. The defendant argues that "[t]he contract contemplates that the resident's assets may be depleted and the resident one day will apply for Medicaid CT Page 4070-g assistance." (See Defendant's Trial Memorandum, p. 7.) Yet, under the defendant's reasoning, it would be perfectly permissible to deplete an entire estate and presumably ask the care giver to render the services for free. The law favors interpreting contacts so as to give the reasonable and rational result. See, Texaco, Inc. v. Rogow, 150 Conn. 401,408, 190 A.2d 48 (1963). The fact that many provisions do refer to Medicaid assistance and indeed the possibility that such governmental aid might be provided for those with no assets cannot be construed to be an agreement that should the responsible party deplete her ward's assets and Medicaid assistance not be received, the responsible party would have no obligation to the facility. Indeed, subparagraph 8(8) states affirmatively to the contrary. Both parties have referred to the addendum entitled "Notice Regarding Medicaid Assistance" attached to the contract, in which it is specifically stated that "[tllhere are special rules governing the effect of gifts on Medicaid eligibility that apply . . ., if you have given money or property to anyone except your spouse during the 30 months before you apply for Medicaid assistance, you may not be eligible for assistance."
The defendant further maintains that notwithstanding the plain language of subparagraph 8(8), the prefatory language of paragraph 8 which states "Medicaid Assistance: [w]ith respect to a applying for and receiving Medicaid (Title XIX) assistance, You agree as follows: . . ." limits the subparagraphs to Medicaid issues only. This court does not agree with such a narrow reading. The requirements of the subparagraph are, of course, consistent with the federal requirements for Medicaid eligibility, i.e. the utilization of one's own assets first. Once utilized, the responsible party must comply with other provisions for eligibility found within the section. Paragraph 8, however, places burdens on the resident and the responsible party beyond the Medicaid application process. For instance, subparagraph 8(5), as mentioned earlier, requires the payment of funds equal to any asset transfer which results in ineligibility until eligibility is established; this is true for a transfer made even before this contract was signed. Subparagraph 8 (6) requires payment to the facility while an application is pending. Subparagraph 8(9) requires a financial disclosure. Simply put, while these subparagraphs do relate to the Medicaid process, they surely go beyond the mechanical application process. Could the contract have been drafted differently; of course. Does this fact make the contract ambiguous or mean it should be construed in an unreasonable manner; no. The operative part of the contract is just broader than the introduction. "The rule has long been established that: "[i]f the recitals are clear and the operative part is ambiguous, the recitals govern the construction, if the recitals are ambiguous, and the operative CT Page 4070-h part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred." Wilson v. Towers, 55 F.2d 199
(4th Cir. 1932). The defendant's argument that "a responsible party who control a resident's assets [must] pay the plaintiff out of the resident's assets, so long as those assets remain available," does not conform with the provisions of this contract. As noted by the defendant, "[w]hen interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." Industrial Risk Insurers v. Hartford Steam Boiler Inspection Ins. Co., 258 Conn. 101, 118, 779 A.2d 737 (2001). Moreover, "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." Rund v.Melillo, 63 Conn. App. 216, 220, 772 A.2d 774 (2001). Subparagraph 8(8) requires the defendant to use her mother's assets for her welfare. She may not ignore this and other related provisions and hide under the sections which exempt her from personal liability.[2] Had the defendant not transferred monies from her mother's account, she would, under this contract have no personal liability. The defendant, however, has breached her contract with the plaintiff by both making the transfers and paying the $31,760.00 for a "companion." Accordingly, this court enters judgment for the plaintiff in the stipulated amount owed of $78,779.09.
Berger, J.